IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| GLENN VOGEL, *et al.*, <br>     Plaintiffs | ) <br> ) <br> ) |
| v. | )   Civil Action No. 1:21-cv-1355 <br> ) |
| GRACIAS JUAN, LLC, <br>     Defendant. | ) <br> ) <br> ) |

## MEMORANDUM OPINION

This contract dispute, which has already been adjudicated by an arbitrator retained jointly by the parties, comes before the Court on cross motions: (i) Plaintiff-Buyers Glenn Vogel and Doug Lee's Motion to Confirm the Arbitration Award (Dkt. 8) and (ii) Defendant-Seller Gracias Juan, LLC's Motion to Vacate the Arbitration Award (Dkt. 4). These motions have been fully briefed and were argued orally on March 11, 2022. The motions are therefore ripe for disposition. For the following reasons, the Buyers' motion to confirm the arbitration award must be granted and the Seller's motion to vacate the arbitration award must be denied.

**I.**

The parties agree on the material facts of this dispute, which are set forth below:

- On November 19, 2019, Plaintiffs Glenn Vogel and Doug Lee (hereinafter "Buyers") entered into an agreement with Nathan Hibler and Defendant Gracias Juan, LLC (hereinafter "Seller") to purchase a 91% interest in Espire Services, LLC (hereinafter "Espire").[1]

- Espire is a Virginia-based government contractor that provides staffing and logistics support to government agencies, including the Department of State, relating to overseas building projects and embassies for the United States government.

---

[1] Although there were two sellers, Nathan Hibler and Gracias Juan, LLC, only Gracias Juan is named as a defendant in this case, and thus Gracias Juan, LLC is referred to as the Seller in this Memorandum Opinion.

1

- The parties' agreement to transfer the 91% interest in Espire from the Sellers to the Buyers was memorialized in a Membership Interest Purchase Agreement (hereinafter "MIPA"). *See* MIPA, Dkt 5-1.

- The MIPA contains a choice of law provision that provides that the MIPA "shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law provision or rule," MIPA § 8.11.

- According to the terms of the MIPA, the Buyers agreed to pay Sellers $5,716,000, in exchange for which the Buyers would receive a 91% membership interest in Espire. *See* MIPA §§ 1.01, 1.02. The MIPA provides that Buyer Glenn Vogel would receive a 51% membership interest in Espire and that Buyer Doug Lee would receive a 40% membership interest in Espire. *See* MIPA § 1.01.

- In accordance with the MIPA, the sale of Espire to the Buyers was financed by Espire securing a $6,000,000 loan from First United Bank and Trust on the closing date of November 19, 2019 (hereinafter "Closing Date"). *See* Dkt. 7-1. Espire provided the loan funds to the Buyers, who used the loan funds to pay the Seller the closing price.

- The MIPA also reflects that the parties assumed that, as of the Closing Date, Espire would have $750,000 in Net Working Capital. *See* MIPA § 1.03(A). The parties understood, however, that Espire's actual Net Working Capital on the Closing Date might differ from the $750,000 that the parties assumed in the MIPA. Therefore, the MIPA also requires a Post-Closing Adjustment Payment to account for the difference between Espire's actual Net Working Capital on the Closing Date with the parties' estimate in the MIPA that Espire's Net Working Capital on the Closing Date was $750,000. *See* MIPA § 1.03.

- The MIPA defines Net Working Capital as "the amount by which all current asserts of the Company ... exceed all current liabilities of the Company." *Id.* The MIPA also specifies that the Net Working Capital shall be calculated "in accordance with United States generally accepted accounting principles ('GAAP')." *Id.*

- The MIPA provides that within 45 days after closing, the Buyers would prepare a Post-Closing Statement that would reflect "the Buyers' good faith calculation of the Net Working Capital as of the Closing Date." MIPA § 1.03.

- The MIPA also provides that in the event of Espire's Net Working Capital on the Closing Date was below the $750,000 figure assumed in the MIPA, the Sellers would make a Post-Closing Adjustment Payment to the Buyers equivalent to the amount that the Net Working Capital was below the $750,000 figure assumed in the MIPA. *See* MIPA § 1.03. The MIPA also provides that in the event that Espire's Net Working Capital on the Closing Date was above the $750,000 figured assumed in the MIPA, then the Buyers would be required to make a Post-Closing Adjustment Payment to the Sellers equivalent

to the amount that the actual Net Working Capital on the Closing Date exceeded $750,000. *Id.*

- The sale of Espire, governed by the MIPA, closed on November 19, 2019.

- On January 7, 2020, Buyers sent the Sellers a Post-Closing Statement, in the form of a spreadsheet, showing the Buyers' calculation of Espire's Net Working Capital at the time of closing. *See* Dkt. 5-2. According to the Buyers' January 7 Post-Closing Statement, the Buyers indicated that Espire's Net Working Capital on the Closing Date was below $750,000. In the January 7 Post-Closing Statement, the Buyers' estimated that the Sellers owed the Buyers $1,133,059 to offset the Net Working Capital deficit and meet the $750,000 Net Working Capital assumption in the MIPA. *See* Dkt. 5-2 at 5. The January 7 Post-Closing Statement tallied numerous liabilities for Espire, including $8,200 owed to a vendor called Charton Strategies and nearly $500,000 in unpaid taxes to the Afghan government. *Id.* at 5.

- On February 17, 2020, the Buyers provided the Sellers with an "updated working capital calculation" that updated the January 7 Post-Closing Statement. *See* Dkt. 7-2. The February 17 update reflected much larger liabilities than the January 7 Post-Closing Statement did. Specifically, the Buyers' February 17 updated Post Closing Statement reflected that on the Closing Date, Espire owed larger sums to both Charton Strategies and the Afghan government than the January 7 Post-Closing Statement had indicated. The February 17 updated Post Closing Statement estimated that the Sellers owed the Buyers $4,886,634 to account for the difference between Espire's actual Net Working Capital on the Closing Date and the parties' $750,000 estimate of Espire's Net Working Capital. *See* Dkt. 7-2 at 4.

- The MIPA provides that if the parties could not agree on the amount of the Post-Closing Adjustment Payment, the parties would retain an independent accounting firm "to arbitrate the dispute and determine the Net Working Capital as of the Closing Date and the Post-Closing Adjustment Payment... ." MIPA § 1.03(D).

- As required by the MIPA, the parties proceeded to negotiate concerning the amount of any Post-Closing Adjustment Payment from the Seller to the Buyers. The parties were unable to come to an agreement as to the amount of that payment and ultimately proceeded to arbitration.

- The MIPA specifies that the parties would seek the services of Joseph Gibbons, an accountant with the firm of Gibbons & Gibbons, P.C. in Vienna, Virginia, but Mr. Gibbons declined to arbitrate the parties' dispute.

- The parties ultimately retained RSM US LLP (hereinafter "RSM"), an independent accounting firm, to arbitrate this dispute. On July 15, 2021, both the Buyers and the Sellers signed an engagement letter with RSM to arbitrate the Net Working Capital dispute. *See* Dkt. 7-9. Specifically, that engagement letter confirmed that the parties "retain[ed] RSM as the Independent Accountant to arbitrate the dispute and determine the

3

Net Working Capital [of Espire] as of the Closing Date and the Post-Closing Adjustment Payment." Dkt. 7-9 at 2.

- The arbitration procedure allowed both the Buyers and the Sellers each to make four written submissions to RSM. *See* Dkt. 7-9. These submissions included initial submissions from each party, as well as responses and replies. *Id.* The parties complied with this procedure and made the requisite submissions to RSM.

- In the course of arbitration, both the Buyers and the Sellers submitted to RSM various accounting items which the parties disputed. *See* Dkt. 7-9 at 38. Sellers contended that they were due nearly $7,000,000, while the Buyers contended that they were due almost $6,000,000. *See id.*

- In their submissions to RSM, the Buyers disputed the extent of Espire's liabilities relating to both Charton Strategies and Afghan taxes. Specifically, the Buyers claimed that as of the Closing Date, Espire owed large sums to both Charton Strategies and the Afghan government, and that these extensive liabilities required the Sellers to make a $6,000,000 payment to the Buyers. *Id.*

- The Seller also submitted to RSM disputed items. *See* Dkt. 7-9. In particular, the Seller argued that Espire's Net Working Capital should have included the $6,000,000 loan which Espire obtained to enable the Buyers to pay the Sellers the sale price. Accordingly, the Seller argued to RSM that the Seller was owed some $5,000,000 because Espire's Net Working Capital greatly exceeded the $750,000 assumption.

- On October 14, 2021, RSM issued its final determination letter. *See* Dkt. 5-5. That sixteen-page letter extensively detailed RSM's findings. *Id.* RSM's findings identified seven disputed items between the parties. *See* Dkt. 8-1 at 2. RSM found in favor of the Buyers on four items and in favor of the Seller on three items. *Id.* at 13. RSM ultimately concluded that the Sellers owed the Buyers $3,097,954. *See* Dkt. 5-5 at 14–16.

- On November 10, 2021, the Buyers filed the instant suit in the Circuit Court of Fairfax County, Virginia, seeking to confirm the arbitration award. *See* Dkt. 1. The Seller timely removed this action to federal court on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1446. After removal, the Seller moved to vacate the arbitration award. *See* Dkt. 4. The Buyers then filed a cross motion to confirm the arbitration award. *See* Dkt. 8. Both motions have been fully briefed, and oral argument was held on March 11, 2022.

- In support of its motion to vacate RSM's arbitration award, the Seller argues (i) that, in accordance with the MIPA, RSM's calculation of Espire's Net Working Capital should have been limited to the financial figures presented in the January 7, 2020 Post-Closing Statement and that RSM erred in considering updated financial figures and (ii) that RSM's award disregarded GAAP accounting principles and thus constituted a manifest disregard of the law. The Buyers argue that the Sellers' arguments are without merit, that RSM's arbitration award is valid, and that the arbitration award should be confirmed.

## II.

As an initial matter, the parties dispute what law governs resolution of this arbitration—the Federal Arbitration Act (hereinafter "FAA," codified at 9 U.S.C. §§ 1–14) or the Virginia Uniform Arbitration Act ("VUAA," codified at Va. Code §8.01–581.09). Specifically, the Buyer argues that the VUAA applies, while the Seller argues that the FAA applies. This dispute is significant, because the Seller's argument that RSM's award represented a manifest disregard for the law is a valid basis to challenge an arbitration award under federal law, but is not a valid basis to challenge an arbitration award under Virginia law.[2] Thus, it is necessary to resolve the parties' choice of law dispute before addressing the parties' substantive arguments.

Buyers argue that the MIPA's choice of law provision, which provides that the MIPA "shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law provision or rule," MIPA § 8.11 (Dkt. 5-1 at 18), means that the VUAA, and not the FAA, applies to the parties' arbitration dispute. Although the Buyers are correct that the MIPA contains a general choice of law provision specifying that Virginia law should apply to disputes arising from the MIPA, the Fourth Circuit has held that "a contract's general choice-of-law provision does not displace federal arbitration law if the contract involves interstate commerce." *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 697 n.7 (4th Cir. 2012).[3] Thus, the FAA applies to

---

[2] Indeed, the Supreme Court of Virginia has rejected the argument that the VUAA permits arbitration awards to be vacated on the ground that the arbitration award demonstrated a manifest disregard for the law. See *SIGNAL Corp. v. Keane Fed. Sys., Inc.*, 574 S.E.2d 253, 257 (Va. 2003).

[3] In support of the argument that the VUAA applies, the Buyers rely on *Penn Virginia Oil & Gas Corp. v. CNX Gas Co.*, 2007 WL 593578 (W.D. Va. Feb. 22, 2007), an unpublished case from the Western District of Virginia which held that a contract's general choice of law provision, which called for the application of Virginia law, displaced federal arbitration law in favor of

5

arbitration disputes arising from contracts involving interstate commerce, and the parties may displace the FAA only by specifying that state law should apply *specifically to arbitration proceedings*. A general choice of law provision, as the MIPA contained, is insufficient to displace the FAA in favor of the VUAA. To this end, the Fourth Circuit has explained that "while the general choice-of-law provision invokes [state] substantive law for issues of contract interpretation," a general choice of law provision "is irrelevant to the decision whether the FAA applies." *Rota-McLarty*, 700 F.3d at 697 n.7.

Given that *Rota-McLarty* applies to this case and is controlling, it is clear that the FAA, and not the VUAA, applies to the instant arbitration dispute. The parties agree that the MIPA involved interstate commerce, for the MIPA governed the sale of Espire, a company that deals with U.S. embassy contracts overseas and is undoubtedly engaged in interstate commerce. The parties could have, but did not, provide in the MIPA that Virginia arbitration law would apply instead of federal arbitration law. But because the MIPA does not contain a choice of law provision which specified which law would apply to arbitration disputes, federal law applies. Thus, the FAA and federal arbitration law applies to this arbitration dispute, and the VUAA is not implicated.

### III.

As a preface to consideration of the parties' arguments on the validity of the arbitration award, it is important to note that under federal arbitration law, a party moving to vacate a final arbitration award faces a "heavy burden." *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007). Judicial review of an arbitration award in federal court is

---

Virginia arbitration law. But the *Penn Virginia* decision, which is not binding precedent, is at odds with *Rota-McLarty*, a later-issued published Fourth Circuit opinion which is binding precedent. *See Rota-McLarty*, 700 F.3d at 697. Although *Penn Virginia* certainly supports the Buyers' argument, that argument must fail in light of *Rota-McLarty*.

"substantially circumscribed," *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006), and as the Fourth Circuit has explained, the scope of this judicial review "is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all — the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998). Thus, a cour'ts review of an arbitration award "is limited to determine whether the arbitrators did the job they were told to do — not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) (internal quotations omitted).

The Federal Arbitration Act permits a reviewing court to vacate an arbitration award on only four grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made
>
> 9 U.S.C. § 10(a).

In addition to the four grounds for vacatur of an award provided in the FAA, the Fourth Circuit has held that an arbitration award may be vacated upon a party's showing of certain common law grounds, including that the award evinces a manifest disregard for controlling law. *See Three S. Del.*, 492 F.3d at 527.

In its motion to vacate the arbitration award, the Seller argues that RSM committed two errors, either of which alone requires vacatur of RSM's award. First, the Seller argues that RSM exceeded its powers by considering financial figures which were not included in the Buyers' January 7, 2020 Post-Closing Statement. Second, the Seller argues that RSM manifestly disregarded the law in its alleged misapplication of GAAP principles to the accounting issues presented during arbitration. As discussed below, neither of these arguments the Seller presents is persuasive, and thus the Seller has identified no basis requiring vacatur of the arbitration award. Each argument is discussed separately below.

### A. RSM did not exceed its power in calculating Espire's Net Working Capital as of the Closing Date

Seller's first argument in support of vacating the arbitration award is that RSM exceeded its power during the arbitration because RSM considered figures presented by the Buyers which were not presented by the Buyers in the January 7, 2020 Post-Closing Statement. *See* Dkt. 5 at 7-8.[4] Seller contends that the MIPA's arbitration provisions cabins the arbitrator's review solely to figures presented in the Post-Closing Statement, and that the arbitrator therefore exceeded its powers by reviewing, in the course of arbitration, updated estimates of Espire's Net Working Capital on the Closing Date. As discussed below, this argument relies on a cramped and untenable reading of the MIPA, and this argument must be rejected.

---

[4] In the January 7, 2020 Post-Closing Statement, the Buyers estimated that Espire's Net Working Capital was approximately $1,000,000 below the $750,000 Net Working Capital target established in the MIPA. *See* Dkt. 5-2. By the time of arbitration with RSM, however, the Buyers had revised their estimates of several of Espire's liabilities, and sought nearly $7,000,000 from the Seller to account for the difference between Espire's actual Net Working Capital and the $750,000 Net Working Capital target established in the MIPA. *See* Dkt. 8-1.

With respect to disagreements about the scope of arbitration resulting from contract disputes, the Supreme Court has stated that "[t]he arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Thus, an arbitrator is afforded great latitude in interpreting contract provisions, as the Fourth Circuit has held that "[s]o long as an arbitrator [interprets the contract provisions] within the confines of the controlling agreement and his interpretation of the agreement is not wholly baseless and without reason, the courts have no business overruling an arbitrator because their interpretation of the contract is different from the arbitrator's." *Merck & Co. v. Int'l Chem. Workers Union Council of United Food & Com. Workers Union, Loc. 94C*, 335 F. App'x 300, 304 (4th Cir. 2009). Thus, the Supreme Court has sustained arbitration awards even where the arbitrator committed "serious error," so long as the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union,* 484 U.S. 29 at 38. Here, a review of the MIPA provision at issue confirms that the arbitrator acted well within the scope of its authority in calculating Espire's Net Working Capital as of the Closing Date.

Section 1.03(D) of the MIPA, which governs the arbitration in this instance, clearly describes the scope of arbitration in the event arbitration is required. Specifically, Section 1.03(D) of the MIPA provides that:

> If the Seller objects to the Post-Closing Statement, the Seller shall deliver to the Buyers a written notice of disagreement (the "Notice of Disagreement") within thirty (30) days following the Seller's receipt of the Post-Closing Statement… [if the] Buyers and the Seller are unable to

>agree upon the Post-Closing Adjustment Payment, then the Buyers and the Seller shall engage …[an] independent accountant mutually agreed-upon by the Buyers and the Seller) (the "Independent Accountant") to arbitrate the dispute and determine the Net Working Capital as of the Closing Date and the Post-Closing Adjustment Payment…

MIPA § 1.03(D).

Distilled to its essence, the Seller's argument is that the arbitrator's authority to resolve "the dispute" as discussed in this provision was strictly confined to the exact line items identified by the Seller in the January 7, 2020 Post-Closing Statement. This argument strains credulity and contradicts the plain language of the contract, as the MIPA expressly authorizes the arbitrator to "determine the Net Working Capital as of the Closing Date and the Post-Closing Adjustment Payment." MIPA § 1.03(D). Nowhere in the MIPA did the parties agree that the arbitrator was required to ignore updated estimates of Espire's finances not known at the time of the initial Post-Closing Statement. To the contrary, the MIPA explicitly authorizes RSM to "determine the Net Working Capital" of Espire at the time the sale closed, which is precisely what RSM did in its detailed award. MIPA § 1.03(D). If the parties had intended to limit the Net Working Capital calculation to the exact estimates of Espire's finances identified in the Post-Closing Statement, they could have inserted such a limitation in the MIPA. But the MIPA contains no such limitation, but instead makes clear the arbitrator was tasked with calculating Espire's actual Net Working Capital as of the Closing Date. Thus RSM acted well within the scope of its authority in calculating its best estimate of Espire's Net Working Capital as of the Closing Date, and nothing in the MIPA compels RSM to use only initial estimates of Espire's finances when better estimates were available to RSM at the time of arbitration.

The Seller's argument is also undermined by the Seller's own behavior during arbitration, as the Seller submitted to RSM various items to include in Net Working Capital, including the proceeds of Espire's $6,000,000 loan (discussed below), where this item was not included in the Post-Closing Statement. It thus appears that the Seller believed at the time of arbitration that the arbitrator was free to consider financial data not included in the Post-Closing Statement.[5] Only now, after receiving an adverse determination from RSM, has the Seller has changed its position and begun to argue that the MIPA's plain language restricts the scope of RSM's review to the exact financial figures contained in the Post-Closing Statement.

In support of its argument that RSM exceeded its authority, the Seller cites inapplicable caselaw where, unlike the instant case, the arbitrator did in fact exceed its authority. For example, in *Raymond James Fin. Servs., Inc. v. Bishop*, 596 F.3d 183, 193 (4th Cir. 2010), the Fourth Circuit vacated an arbitration award where the arbitrator had been tasked with resolving an employment dispute but instead issued an award on the basis that defendant had breached its fiduciary duty as an attorney (and not as an employer) for the plaintiffs. In *Raymond James*, the Fourth Circuit explained that the arbitrator erred in "rendering an award whose underlying legal basis exceeded the bounds of arbitrable employment-related disputes cognizable under" the contract giving rise to arbitration. *Id.* at 193-94).

---

[5] Further, the Seller likely waived its argument that RSM's arbitration was limited to the financial figures contained in the January 7 Post Closing Statement by supplying RSM with financial figures that were not included in that statement. As numerous other courts have observed, a party that does not raise an objection during arbitration is deemed to have waived that objection. *See, e.g.*, *Kiernan v. Piper Jaffray Companies, Inc.*, 137 F.3d 588 (8th Cir. 1998); *Singh v. Interactive Brokers LLC*, 2019 WL 6883794 (E.D. Va. Dec. 17, 2019).

But the instant case is readily distinguishable from *Raymond James*, for RSM adjudicated the exact dispute the parties asked it to resolve—Espire's Net Working Capital as of the Closing Date. There is no doubt that the parties agreed that RSM would calculate Espire's Net Working Capital as of the Closing Date, and RSM's determination letter reflects that RSM made such a calculation. To the extent that the Seller believes RSM misinterpreted the MIPA, which RSM did not do, other district courts have held that "courts generally find that it is within the province of the arbitrating accountant, and not the court, to determine the scope of arbitration." *McLaughlin v. Day & Zimmerman Int'l, Inc.*, 2009 WL 10689227, at *5 (E.D. Va. Apr. 24, 2009) (citing *Manifest Corp. v. Random House, Inc.*, 2007 WL 1974911, at *5-6 (D. Or. July 2, 2007)). Thus, RSM did not exceed its authority under the MIPA, and thus there is no basis to vacate RSM's arbitration award on this ground.

### B. RSM did not manifestly disregard the law in its application of GAAP principles to Espire's Net Working Capital as of the Closing Date

The Seller's second argument is that RSM manifestly disregarded the law in its application of GAAP principles to calculate Espire's Net Working Capital on the Closing Date. Specifically, the Seller argues that RSM should have, but did not, determine that the $6,000,000 loan taken by Espire to finance the Buyers' purchase of Espire qualified as a current asset of Espire as of the Closing Date. This argument also fails. To be sure, binding Fourth Circuit caselaw requires vacatur of an arbitration award if that award reflects a "manifest disregard of the law and was not drawn from the essence of the governing arbitration agreement." *Patten*, 441 F.3d at 235. But the Seller has not established that RSM's award determination reflected a manifest disregard of relevant

GAAP principles. Ultimately, the Seller seeks *de novo* review of the arbitrator's award, but such review would frustrate the core purpose of arbitration and is thus impermissible.

In *Patten*, the Fourth Circuit held that an "arbitrator's legal determination may only be overturned where it is in manifest disregard of the law," and that an arbitrator's interpretation of a contract "must be upheld so long as it draws its essence from the agreement." *Patten*, 441 F.3d at 235 (citations omitted). Importantly, the Fourth Circuit explained that "an arbitration award does not fail to draw its essence from the agreement merely because a court concludes that an arbitrator has misread the contract." *Id.* Instead, "[a]n arbitration award fails to draw its essence from the agreement only when the result is not rationally inferable from the contract." *Id.* As an example, in *Patten* the Fourth Circuit held that the arbitrator manifestly disregarded the law by concluding, in the course of arbitration, that the contract "included an implied one-year limitations period" even though the parties had agreed in the arbitration agreement that Massachusetts law, which provided for a longer statute of limitations, would apply to their dispute. *Id.* at 235.

The Seller's disagreement with RSM's determination focuses on the $6,000,000 loan which Espire obtained to finance the sale of Espire from the Seller to the Buyers. The parties agree that Espire obtained this loan to enable the Buyers to pay the Sellers, advanced the money from the loan to the Buyers, and that the Buyers then paid the money from the loan to the Sellers. In essence, the Seller argues that the loan, which was used to finance the sale of Espire and the proceeds of which were transferred to the Sellers at 11:59 p.m. on the Closing Date, *see* MIPA § 1.06, should have been counted as part of Espire's current assets and thus should have been credited against the Net Working Capital Target of $750,000. In the Seller's view, GAAP provision ASC 210-10-

45-1(d) requires that the $6,000,000 loan be counted as one of Espire's assets and thus RSM should have (i) concluded that Espire's Net Working Capital greatly exceeded the $750,000 and (ii) required the Buyers to pay the Sellers some $5,000,000 representing the balance of the loan above the $750,000 target.

This argument is erroneous on its face. The $6,000,000 loan was taken by Espire for the purpose of funding the sale of Espire. On the Closing Date, the proceeds of this loan were transferred from Espire to the Buyers, and then remitted from the Buyers to the Sellers. It makes no sense to include this sum in Espire's Net Working Capital, as the MIPA defines Net Working Capital as "the amount by which all current assets of the Company (including cash, prepaid expenses, and accounts receivable) exceeds all current liabilities of the Company (including accounts payable and accrued expenses," MIPA § 1.03(A), but the loan proceeds were not a current asset of Espire on the Closing Date. To hold otherwise would require the Buyers to pay the purchase price to the Sellers twice-over: once through the Espire's loan and again through a Post-Closing Adjustment Payment when that loan was included in Espire's Net Working Capital.

The Seller made this argument to RSM in the course of arbitration, but RSM rejected the argument as erroneous. In its detailed rejection of this argument, RSM reasoned that the loan "does not appear to fit the criteria of a pre-closing current asset." Dkt. 8-1 at 9. In reaching this conclusion, RSM cited the definition of Net Working Capital as "current assets of the Company." *Id.* (citing MIPA § 1.03). RSM explained that the loan "was entered into for the sake of financing the transaction, and is separate apart from the ongoing operations of the business" and concluded that the loan proceeds "should therefore be excluded from Net Working Capital." *Id.*

As the party challenging the validity of the arbitration, the Seller bears the "burden of showing that the arbitrator manifestly disregarded the law." *Jones v. Dancel*, 792 F.3d 395, 403 (4th Cir. 2015). The Seller has not satisfied this burden. Nothing in the Seller's motion to vacate suggests that RSM manifestly disregarded the law in concluding that the loan proceeds should be excluded from Espire's Net Working Capital. In support of its motion, the Seller relies on GAAP provision ASC 210-10-45-1(d), arguing that that provision required RSM to include the loan proceeds in Espire's Net Working Capital. But GAAP provision ASC 210-10-45-1(d) merely provides that current assets "*generally* include receivables from officers, employees, affiliates and others if collectible in the ordinary course of business within one year," *see* Dkt. 5 at 11 (emphasis added), and does not provide that such items are *always* included in current assets. Moreover, there is little doubt that RSM, an independent accounting firm selected by the parties to resolves this accounting dispute, is in a better position to apply GAAP principles to evaluate accurately Espire's finances. Indeed, in its detailed determination letter RSM expressly relied on GAAP principles in resolving the parties' dispute, as the MIPA requires. *See* Dkt. 8-1. Distilled to its essence, the Seller's argument "does nothing more than challenge the arbitrator's interpretation of applicable law" and GAAP principles. *Jones*, 792 F.3d at 403. This argument is thus plainly insufficient to vacate RSM's arbitration award, and according the Seller's motion to vacate must be denied and the Buyers' motion to confirm must be granted.

## IV.

The Fourth Circuit has clearly held that such arbitration agreements should be subject to only "limited review" and that such limited review "is appropriate given the fact that the arbitral forum is designed to assist parties in avoiding much of the expense and delay that often is associated with litigation." *Jones*, 792 F.3d at 401. The Seller's challenge to RSM's arbitration award, as explained above, fails to meet the extraordinarily high bar for a challenge to an arbitration award. For the foregoing reasons, the Seller's motion to vacate the arbitration award must be denied and, for the same reasons, the Buyer's motion to confirm the arbitration award must be granted.

An Order reflecting the conclusions of this Memorandum Opinion will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
August 9, 2022

/s/ 
T. S. Ellis, III
United States District Judge